UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: SANDIA RESORTS, INC.,	No. 11-15-11532 JA

    Debtor.

**MEMORANDUM OPINION**

Sandia Resorts, Inc. ("Sandia Resorts") owns an America's Best Value Inn (the "Hotel") in Albuquerque, New Mexico. This Chapter 11 case is Sandia Resorts' second attempt to reorganize in three years. First National Bank of Santa Fe ("FNBSF"), Sandia Resorts' largest creditor in this Chapter 11 case and in the first Chapter 11 case, does not want Sandia Resorts to use this second Chapter 11 case to thwart its foreclosure efforts in state court where a receiver was appointed prior to the fling of this Chapter 11 case.

FNBSF filed a motion to dismiss Sandia Resorts' Chapter 11 case ("Motion to Dismiss"[1]), and a motion to excuse turnover of the Hotel ("Motion for Relief from Turnover"[2]). Sandia Resorts filed an adversary proceeding against FNBSF and C. Randal Lewis, Western Receiver, Trustee and Consulting Services, Ltd. ("Receiver") requesting turnover of Sandia Resorts' assets and the operation of the Hotel to Sandia Resorts. *See* Adversary Proceeding No. 15-1067 (the "Adversary Proceeding"). The Court held a final, evidentiary hearing on November 24, 2015 on the merits of the Motion to Dismiss and the Motion for Relief from Turnover together with a trial on the merits of the Adversary Proceeding. At the close of the hearing, the Court authorized the parties to submit optional post-trial briefs on the issue of

---

[1] *See* Motion for Dismissal of Case Pursuant to 11 U.S.C. § 305(a)(1) and/or 11 U.S.C. § 1112(b)(2)(B) – Docket No. 9.
[2] *See* Motion for Interim Relief Pursuant to 11 U.S.C. § 543(D) from Turnover of Property and/or Dismissal of Case Pursuant to 11 U.S.C. § 305(a) and/or 11 U.S.C. 1112(b)(2)(B) – Docket No. 7.

whether a debtor may file a second Chapter 11 case to restructure debt that had already been restructured in a prior Chapter 11 case. Sandia Resorts and FNBSF each submitted a post-trial brief.[3]

After carefully considering the evidence in light of the parties' arguments and applicable law, the Court concludes that Sandia Resorts' second Chapter 11 bankruptcy case is an impermissible attempt to circumvent the prohibition against modification of a Chapter 11 plan after substantial consummation and that cause exists to dismiss this Chapter 11 case. The Court will, therefore, grant the Motion to Dismiss, deny the Motion for Turnover, and dismiss the Adversary Proceeding.

FACTS

Harminder Sian is the president and sole shareholder of Sandia Resorts. In 2004, Mr. Sian executed a promissory note on behalf of Sandia Resorts in the principal amount of $1,950,000 in favor of FNBSF (the "Note"). *See* Exhibit GG. The Note was amended by a Change in Terms Agreement executed in May of 2009 which changed the principal amount of the indebtedness to $1,705,525.65, and another promissory note executed by Mr. Sian on behalf of Sandia Resorts in favor of FNBSF on July 1, 2009 which adjusted the principal amount of the debt to $1,963,737.70. *See* Exhibit GG. The indebtedness to FNBSF is secured by a mortgage on the real property where the Hotel is located, an assignment of rents, a security agreement, and UCC-1 financing statements. *Id.* Mr. Sian currently resides in two rooms at the Hotel, and has lived on site since 2012. He operated and managed the Hotel until the appointment of the Receiver.

---

[3] *See* Docket Nos. 46 (Sandia Resorts' brief) and 47 (Sandia Resorts' supplement correcting typographical errors in Docket No. 46), and Adversary Proceeding No. 15-1067, Docket No. 24 (FNBSF's brief).

2

Sandia Resorts filed its first Chapter 11 case on August 1, 2011 as Case No. 11-11-13489 TA (the "First Chapter 11 Case"). At that time, FNBSF was Sandia Resorts' largest secured creditor. It filed a proof of claim in the First Chapter 11 Case asserting a secured claim in the amount of $2,000,000. *See* Exhibit GG.

In the First Chapter 11 Case Sandia Resorts filed a Chapter 11 disclosure statement and plan of reorganization on January 18, 2012,[4] and a first amended plan of reorganization ("Amended Plan") and proposed first amended disclosure statement ("First Amended Disclosure Statement") on April 30, 2012. *See* Exhibits 3 and 4. As part of the First Amended Disclosure Statement, Sandia Resorts attached a proposed budget for the remainder of 2012, and for 2013 through 2018. *See* Exhibit 4. The budget included a monthly capital expenditure expense. The budgeted capital expenditures for the remainder 2012, and all of 2013 through 2018 are as follows:

|  | Jan. | Feb. | Mar. | Apr. | May | Jun. | Jul. | Aug. | Sept. | Oct. | Nov. | Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | -- | -- | -- | $3,814 | $3,000 | $4,000 | $2,500 | $3,000 | $2,000 | $5,000 | 0 | 0 |
| **2013** | $0 | $0 | $3,000 | $3,000 | $3,000 | $5,000 | $3,000 | $3,000 | $3,000 | $5,000 | $2,000 | $2,000 |
| **2014** | $0 | $0 | $3,000 | $2,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $5,000 | $0 | $0 |
| **2015** | $0 | $0 | $10,000 | $10,000 | $15,000 | $15,000 | $15,000 | $15,000 | $0 | $0 | $10,000 | $10,000 |
| **2016** | $0 | $0 | $3500 | $3500 | $7,000 | $7,000 | $7,000 | $7,000 | $5,000 | $0 | $5,000 | $5,000 |
| **2017** | $0 | $0 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| **2018** | $0 | $0 | $4,000 | $4,000 | $4,000 | $6,000 | $6,000 | $6,000 | $6,000 | $3,000 | $3,000 | $3,000 |

*See* Exhibit 5.

---

[4] *See* First Chapter 11 Case – Docket Nos. 51, 52.

3

The proposed budgeted monthly capital expenditure was as high as $15,000 for May through August of 2015. *Id.* Sandia Resorts proposed this budget as part of its First Chapter 11 Case with assistance of counsel. The court approved the First Amended Disclosure Statement in the First Chapter 11 Case on May 18, 2012.

Sandia Resorts modified the Amended Plan three times. *See* Exhibit 3. The Third Modification of Debtor's Amended Plan of Reorganization dated April 30, 2012 ("Third Modification") provided for payment to FNBSF in equal monthly principal and interest payments of $12,595.95 beginning August 5, 2012 until the maturity date of August 5, 2016. *Id.* The Third Modification also required the Debtor to make monthly escrow payments to FNBSF to cover 1) post-petition taxes; 2) insurance; and 3) capital expenditures as proposed in the budget attached to the Amended Disclosure Statement. *Id.* The purpose of the capital expenditure monthly escrow payments was to provide:

> funds to cover capital repairs and/or replacements for deferred maintenance items currently existing on site at the America Best Value Hotel . . . with the agreement that if Sandia Resorts, Inc. and Lender [FNBSF] cannot agree on the use of such funds, the issue shall be submitted to Peak Hospitality, a third party hospitality expert, to determine best use of funds to address deferred maintenance with the goal being to improve both the short term and long term market viability of the Hotel. If Sandia Resorts feels that the decision of Peak Hospitality is arbitrary or capricious, the parties agree that the bankruptcy court shall be the court of review. This provision is not intended to inject Lender or Peak Hospitality into the role of managing the operation of the Hotel, but to provide Lender review and input on the use of funds for capital expenditures needed to address deferred maintenance at the Hotel.

*Id.*

The Amended Plan, as modified by the first, second, and Third Modification, was confirmed on July 26, 2012 (the "Confirmed Plan"). *See* Exhibit 6. The final decree was entered in the First Chapter 11 Case on December 3, 2012. The First Chapter 11 Case was closed on the same date.

Payments to FNBSF of principal and interest and payments to the escrow account were due on the fifth day of each month, beginning in August 2012. *See* Third Modification – Exhibit 26. Sandia Resorts made the principal and interest payments to FNBSF and to the escrow account as required under the terms of the Confirmed Plan until May of 2014 when it could not afford to make the increased capital expenditure escrow payment. In April 2014, Mr. Sian, through counsel, indicated to counsel for FNBSF that he wanted FNBSF to agree to eliminate the capital expenditure escrow payments beginning in May 2014. *See* Exhibit HHH. The May 2014 capital expenditure escrow payment was the first time the payment increased to $10,000. Sandia Resorts made no payments to FNBSF from May of 2014 until the appointment of the Receiver in late September 2014. It continued to make payments to other creditors under the Confirmed Plan until September of 2014.

*The Condition of the Hotel, Ongoing Repair Needs, and Other External Factors Affecting the Hotel's Profitability*

The Hotel opened in 1994. It has 80 guest rooms, a fitness room, a meeting room, a pool, vending machines, and coin operated washing machines and dryers. It does not have an on-site restaurant, but provides breakfast to its guests. There is a restaurant next door to the Hotel. National hotel chains that "flag" a hotel require the hotel to meet the national hotel chain's required standards. The Hotel was originally flagged as a Ramada Inn. It lost its Ramada flag some time ago and is currently flagged as an America's Best Value Inn, which is a lower tier hotel brand, and which generally has the least expensive room rates of non-independent "flagged" hotels. As an America's Best Value Inn, the Hotel allows pets at an extra charge of $10 per day. As a budget hotel, the Hotel has lower revenue but also lower operating costs.

Hotels typically undergo a product improvement plan, referenced in the hotel industry as a "PIP," every five to seven years. Carpets and mattresses generally should be replaced every

5

five to seven years. To pay for ongoing capital improvements, repairs, and renovations, such as carpet replacement, furniture replacement, and other major repairs, a hotel generally retains and reserves 4% to 5% of its revenue annually. Deferred capital improvements for the Hotel has been an ongoing issue since before the filing of the First Chapter 11 Case. A renovation cost estimate prepared in October 2011, recommended furniture improvements for the guest rooms, upgrades for the public areas and back of house, and construction costs, and re-flagging costs, altogether totaling $952,263. *See* Exhibit 12. Of that amount, $327,917 was attributed to construction items, including a budgeted 5% contingency of $15,615. *Id.*

In late 2013 the Hotel required repair of the roof over the pool area. Sandia Resorts submitted to FNBSF a budget for the roof repair prepared on February 18, 2014 by A+ Construction Co., and requested FNBSF to release funds from the capital expenditure escrow account to cover the repair costs. *See* Exhibits JJJ and HHH. Continued email correspondence between Sandia Resorts' counsel and FNBSF's counsel show that FNBSF requested the following documents before it would release the funds: 1) a final invoice for the work; 2) a copy of the building permit; 3) a final lien release from the construction company that performed the work; 4) borrower's written request for payment; and 5) a certification that the work was completed, has passed all city inspections, and that with delivery of the final check to the construction company all materials for the swimming pool area roof reconstruction project would be paid. *See* Exhibit HHH. FNBSF released the check for final payment of the pool roof repairs on April 24, 2014. *Id.* The roof over the pool area was fully repaired by June of 2014. Disputes arose regarding Sandia Resorts' use of escrow funds to repair the roof. There is no evidence before the Court that Sandia Resorts followed the procedures outlined in the Third Modification in the event Sandia Resorts and FNBSF could not agree on the use of the capital expenditure

6

escrowed funds. Further, there is no evidence regarding the amount of lost Hotel revenue caused by any delay by FNBSF in releasing funds from escrow for the repair of the roof.

The Hotel is currently in need of substantial capital improvements. Much of the carpet is threadbare, though Mr. Sian had the carpet replaced in the lobby and upstairs. He also replaced a pool heater, added a new vending machine, and new washers and dryers for guest laundry. The fitness room is being used as a storage room for furniture. It has not been used as a fitness room for at least three or four years, and perhaps as far back as 2004 when Mr. Sian first started managing the Hotel. The case goods and furnishings in the guest rooms need to be replaced.

During a period following the First Chapter 11 Case, the City of Albuquerque underwent a large highway construction project to reconfigure the interchange at Paseo Del Norte, Jefferson, and Interstate 25 ("I-25"). Paseo Del Norte is one exit south of Alameda Boulevard and I-25 where the Hotel is located. There is no evidence regarding the amount of lost Hotel revenue, if any, attributable to the construction.

*The State Court Foreclosure Action and the Appointment of a Receiver*

FNBSF filed a complaint against Sandia Resorts, Harminder S. Sian, and others in the Second Judicial District Court as Case No. CV-2011 06528 (the "State Court Action") on June 28, 2011, before the filing of the First Chapter 11 Case, to collect on the indebtedness, foreclose the mortgage and security interests, and appoint a receiver. *See* Exhibit 16. After Sandia Resorts defaulted under the terms of the Confirmed Plan in the First Chapter 11 Case, FNBSF sought to appoint a receiver in the State Court Action. The Receiver was appointed in the State Court Action on September 29, 2014. *See* Exhibit 16. The Receiver retained Peak Hospitality, LLC ("Peak") to operate and manage the Hotel. *See* Receiver's Report for the Period September 20 through November 30, 2014 – Exhibit 23.

7

Since the appointment of the Receiver, the Hotel has improved its Smith Travel and Research ("STAR") report rating by keeping the Hotel extremely clean and friendly. The Receiver has been filing regular reports in the State Court Action that describe its management and operations activities during the reporting period and provide a detailed accounting for the reporting period. *See, e.g.,* Exhibits 23 and 24. For 2015, the Receiver's fees, including legal fees, total $45,562, a monthly average of about $3,800. Peak also charges a monthly fee of 3% of gross revenue to manage the Hotel. In addition, the general manager of the Hotel earns an annual salary of $42,000. The anticipated total Hotel room revenue for 2015 is $630,000. As of November 19, 2015, the total room revenue was $590,241. The Receiver has increased gross revenue by $37,000 in 2015 compared to the same time in 2014, though its profit and loss statement shows a negative balance due to an offset for accrued property taxes. The Receiver remains in possession of the Hotel.

*Mr. Sian's Individual Chapter 7 Case*

Mr. Sian filed an individual Chapter 7 bankruptcy case on September 25, 2014 (the "Individual Chapter 7 Case"). *See* Case No. 7-14-12868 JA. As part of the Individual Chapter 7 Case, Mr. Sian sought to enforce the automatic stay to stop FNBSF from continuing the State Court Action. This Court determined that the automatic stay applied "to any action by FNBSF or the receiver to evict the Debtor from his apartment at the hotel premises" but that "[t]he automatic stay does not apply to the appointment of a receiver over property owned by Sandia Resorts, Inc., including the operation of the hotel." Order Granting, in part, and Denying, in part, Emergency Motion to Enforce Automatic Stay – Exhibit No. 17. Mr. Sian received a discharge on January 6, 2015. *See* Discharge of Debtor Harminder Sian – Exhibit No. 18. The discharge

included a discharge of Mr. Sian's obligations to FNBSF under his personal guaranty of Sandia Resorts' indebtedness to FNBSF.

*The Second Chapter 11 Case*

Sandia Resorts filed this Chapter 11 case (the "Second Chapter 11 Case") on June 9, 2015. *See* Notice of Bankruptcy Case Filing – Exhibit 20. FNBSF filed the Motion to Dismiss on June 17, 2015. FNBSF is, once again, Sandia Resorts' largest creditor. It is owed approximately $1,900,000.[5] The Internal Revenue Service ("IRS") filed a claim in the Second Chapter 11 Case for $9,237.54. It is the same debt as the IRS claim filed in the First Chapter 11 Case. The Bernalillo County Treasurer filed two claims: a claim for delinquent property taxes for the Hotel in the amount of $156,965.43 (Claim 2-1); and a claim for delinquent personal property taxes from 2008 to 2014 in the amount of $10,220.06 (Claim 4-1). Ramada Corp. also filed a claim in the Second Chapter 11 Case for the same debt as in the First Chapter 11 Case.

Mr. Sian believes that he could increase the Hotel's net operating income if he did not have to pay the Receiver's fees or Peak's management fees, and, instead, paid himself the general manager's salary of approximately $42,000 to operate the Hotel. He testified that his fees to do the work that the Receiver, the general manager, and Peak do altogether would be $48,000 per year. Mr. Sian views the $10,000 capital escrow payment required under the Third Modification in the First Chapter 11 case as a "mistake." He testified further that he will not agree in the Second Chapter 11 Case to place funds in an escrow account for capital expenditures.

---

[5] After the hearing on the Motion to Dismiss, NCG, LLC acquired FNBSF's claim and filed a proof of claim based on the debt originally owed to FNBSF. *See* Claims Register 9-1.

9

DISCUSSION

FNBSF requests dismissal of Sandia Resorts' bankruptcy case under 11 U.S.C. § 1112(b)[6] on grounds that Sandia Resorts filed the Second Chapter 11 Case in bad faith for the purpose of frustrating FNBSF's rights, and that Sandia Resorts is unable to propose a feasible plan.[7] "Section 1112(b) provides a nonexhaustive list of grounds upon which a bankruptcy court may dismiss a Chapter 11 case for 'cause.'" *Frieouf v. United States (In re Frieouf),* 938 F.2d 1099, 1102 (10th Cir. 1991). Dismissal for "cause" under § 1112(b)[8] can be based on a debtor's lack of good faith in filing a Chapter 11 case.[9] A second Chapter 11 bankruptcy case filed for the purpose of restructuring a debt that was restructured in an earlier Chapter 11 case in which the plan was substantially consummated may evidence a debtor's lack of good faith warranting dismissal of the second case for "cause" under § 1112(b).[10]

---

[6] All further statutory references in this Memorandum Opinion are to Title 11 of the United States Code.

[7] FNBSF also requests the Court to dismiss Sandia Resorts' bankruptcy case under § 305(a). Because the Court finds that dismissal is appropriate under § 1112(b), the Court need not address FNBSF's request for dismissal under § 305(a).

[8] Section 1112(b) provides, in relevant part:
> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . .
> 11 U.S.C. § 1112(b).

[9] *See Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza),* 719 F.3d 1253, 1263 (11th Cir. 2013) (acknowledging that "'for cause' in 11 U.S.C. §[ ] 1112(b) . . . includes bad faith or a lack of good faith.") (citations omitted); *In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3rd Cir. 1999) ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith."); *In re Marsch,* 36 F.3d 825, 828 (9th Cir. 1994) (acknowledging that "[a]lthough section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal.") (citations omitted). *Cf. In re Nursery Land Dev., Inc.,* 91 F.3d 1414 (10th Cir. 1996) (imposing sanctions against attorney and principal of Chapter 11 debtor based on bad faith filing of Chapter 11 petition).

[10] *See, e.g., Elmwood Dev. Co. v. General Elec. Pension Trust (In re Elmwood Dev. Co.),* 964 F.2d 508 (5th Cir. 1992) (dismissing second chapter 11 case for cause based on a lack of good faith where the proposed plan in the second Chapter 11 case would contradict terms of the confirmed, substantially consummated plan in the earlier Chapter 11 case); *Roxy Real Estate Co., Inc.,* 170 B.R. 571 (Bankr.E.D.Pa. 1993) (dismissing second Chapter 11 reorganization filed shortly after substantial consummation of first reorganization plan on grounds of bad faith); *In re Triumph Christian Center, Inc.,* 493 B.R. 479 (Bankr.S.D.Tex. 2013) (dismissing on grounds of bad faith successive Chapter 11 case filed after defaulting on payments under confirmed, substantially consummated plan in prior Chapter 11 case). *See also Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859, 867 (7th Cir. 1989) (acknowledging that courts dismissing a second chapter 11 case "certainly could have concluded. . . in light of the Code's policy against modification of substantially consummated plans, [that] a serial Chapter 11 filing designed to evade an existing plan was in bad faith.").

Courts examining whether a debtor may file a second Chapter 11 case often begin with the premise that the Bankruptcy Code contains no express prohibition against filing successive Chapter 11 cases.[11] However, assessing the debtor's good faith in a successive Chapter 11 case requires greater scrutiny. *See Lincoln Nat'l Life Ins. Co. v. Buoy, Hall & Howard and Associates (Buoy, Hall & Howard and Associates),* 208 B.R. 737, 743 (Bankr.S.D.Ga. 1995) (observing that, because good faith is a requirement in every Chapter 11 case, the court's assessment of good faith in a successive Chapter 11 case requires greater scrutiny). The debtor must show "that the second petition is not an attempt to thwart the initial bankruptcy proceedings." *Id.* (citing *Elmwood,* 964 F.2d at 511).

Consistent with § 1127(b), which allows post-confirmation modification "*before* substantial consummation," a corporate debtor may not modify a plan *after* the plan has been substantially consummated. 11 U.S.C. § 1127(b) (emphasis added).[12] A second chapter 11 case that restructures a debt already restructured through a substantially consummated plan in an earlier chapter 11 case could, therefore, circumvent § 1127(b) by accomplishing what it

---

[11] *See, Jartran,* 886 F.2d at 866-67 ("it is . . . clear that the provisions of the Code permit the arrangement at issue here [a successive Chapter 11 case]; serial Chapter 11 filings are permissible under the Code if filed in good faith . . ."); *Elmwood,* 964 F.2d at 511 ("[T]he mere fact that a debtor has previously petitioned for bankruptcy relief does not render a subsequent Chapter 11 petition *'per se'* invalid."); *In re Adams,* 218 B.R. 597, 601 (Bankr.D.Kan. 1998) ("[T]here is no per se prohibition of successive bankruptcy filings.") (citation omitted); *In re Northtown Realty Co., L.P.,* 215 B.R. 906, 911 (Bankr.E.D.N.Y. 1998) (recognizing "that there is no *per se* or blanket prohibition on subsequent chapter 11 filings by corporate debtors.") (citations omitted). *See also, Johnson v. Home State Bank,* 501 U.S. 78, 87, 111 S.Ct. 2150, 2156. 115 L.Ed.2d 66 (1991) (finding no prohibition in the Bankruptcy Code against filing a chapter 13 petition following a chapter 7 petition, and concluding that "Congress did not intend categorically to foreclose the benefit of Chapter 13 reorganization to a debtor who previously has filed for Chapter 7 relief.") (citation omitted).

[12] Section 1127(b) provides:
> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and **before** substantial confirmation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.
> 11 U.S.C. § 1127(b) (emphasis added).

*See also, Adams,* 218 B.R. at 600 ("[W]hen a confirmed plan has been substantially consummated, the debtor may no longer modify its provisions under § 1127.").

11

prohibits.[13] In addition, the binding effect of a confirmed Chapter 11 plan and res judicata principles weigh against allowing a second Chapter 11 filing to restructure the same debt as in the first Chapter 11 case.[14] Consequently, a corporate debtor generally is prohibited from filing a second Chapter 11 case which has the effect of modifying a substantially consummated confirmed plan of reorganization in a prior Chapter 11 case.[15]

Courts have recognized certain situations, however, when it is appropriate to allow a successive Chapter 11 case notwithstanding the prohibition against post-substantial consummation modifications contained in § 1127 and the plan's binding *res judicata* effect under § 1141.[16] The generally recognized exceptions allowing a corporate debtor to file a second Chapter 11 case that restructures the same debt a second time include: 1) when the debtor seeks to file a liquidating plan;[17] 2) where "the reorganized debtor is a 'large debtor' with many

---

[13] *See, Triumph Christian Center,* 493 B.R. at 487 ("[A] second Chapter 11 filing may contravene section 1127(b) of the Code, which prohibits modification of a confirmed plan of reorganization once the plan has been substantially consummated.") (citation omitted); *Northtown Realty,* 215 B.R. at 911 ("the filing of a second chapter 11 whose purpose is to modify a prior plan is an act so akin to modifying the previous plan within the meaning of § 1127(b) that the new filing is viewed as a post-substantial consummation modification prohibited by the statute.") (citations and internal quotation marks omitted).

[14] *See* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor . . . and any creditor . . . "); *Adams,* 218 B.R. at 600 (acknowledging that "[t]he terms of a confirmed plan usually represent the results of negotiations between the debtor and its creditors, and the parties should be able to rely on the finality of those terms.").

[15] *See Adams,* 218 B.R. at 600 ("Courts agree that the general rule is that a reorganized debtor may not file a new plan to effect a modification of its substantially consummated plan.") (citations omitted); *Bouy, Hall & Howard,* 208 B.R. at 743 (acknowledging that "[a] debtor should not be permitted to routinely file a successive Chapter 11 reorganization where it has defaulted on a confirmed, substantially consummated plan of reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan."); *In re Tillotson,* 266 B.R. 565, 568 (Bankr.W.D.N.Y. 2001) (stating that "[c]ourts do not permit a debtor to avoid the binding effect of 11 U.S.C. § 1141 by filing a second Chapter 11 petition to achieve a modification that would be prohibited under § 1127); *Triumph Christian Center,* 493 B.R. at 487 ("'[A] debtor generally should not be permitted to go forward with a successive Chapter 11 reorganization where it has defaulted on a confirmed, substantially consummated plan o[f] reorganization, because such an effort would, in effect, constitute an impermissible attempt to modify a substantially consummated plan.'") (quoting *Matter of Savannah, Ltd.,* 162 B.R. 912, 915 (Bankr.S.D.Ga. 1993)).

[16] When a debtor has incurred new debt after confirmation of a plan in the prior Chapter 11 case, and does not seek to modify obligations relating to the previously restricted debt in a successive Chapter 11 case would not impermissibly effectuate a modification of a substantially consummated plan. *See In re Garsal Realty, Inc.,* 98 B.R. 140, 150 (Bankr.N.D.N.Y. 1990) (second chapter 11 case was not attempt to modify the plan contrary to § 1127(b) because the new debt did not exist until after substantial consummation of the earlier plan)). In that situation, the second Chapter 11 restructures the new debt.

[17] *See Jartran,* 886 F.2d at 866-867 (permitting second Chapter 11 filing which proposed a liquidating plan);

12

employees";[18] and 3) where there has been an extraordinary, unanticipated, and unforeseeable change in circumstances since the first Chapter 11 case.[19] Under the unforeseeable or unanticipated change exception, "the unforeseeable or unanticipated change in circumstances must have affected the debtor's ability to fully perform under its confirmed plan." *In re Caviata Attached Homes, LLC,* 481 B.R. 34, 47 (9th Cir. BAP 2012) (citations omitted). "The occurrence of ordinary, foreseeable risks of doing business should not relieve the debtor of the terms of its confirmed plan." *Adams,* 218 B.R. at 601. Other factors relevant to the Court's determination of whether a debtor should be allowed to proceed with a successive Chapter 11 case include:

1) The length of time between the first and second Chapter 11 case;

2) Whether creditors consent to the second Chapter 11 reorganization; and

3) The extent an objecting creditor's rights were modified in the first Chapter 11 case and its proposed treatment in the second Chapter 11 case.

*See Buoy,* 208 B.R. at 744 (enumerating five factors).[20]

Application of these standards to the evidence and taking into account the above factors suggests that dismissal of the Second Chapter 11 Case is appropriate. Sandia Resorts confirmed its plan in the First Chapter 11 Case on July 26, 2012. A state court appointed a receiver for

---

[18] *In re Nordyke Ventures, LLC,* 2011 WL 808193, *5 (Bankr.D.Kan. Mar. 2, 2011).
[19] *See Elmwood,* 965 F.2d at 511 ("unanticipated changed circumstances may justify a valid successive request for Chapter 11 relief.") (citations omitted); *Triumph Christian,* 493 B.R. at 487 (recognizing a limited exception where "unanticipated changed circumstances which were unknown at the time of substantial consummation of the prior plan . . . substantially affected the debtor's ability to perform that plan") (internal quotation marks and citations omitted); *Adams,* 218 B.R. at 601 (recognizing that "where events and occurrences have transpired that are extraordinary and not reasonably foreseeable, the debtor should not be forever barred from attempts to reorganize."); *In re Casa Loma Associates,* 122 B.R. 814, 818 (Bankr.N.D.Ga. 1991) ("unforeseen changed circumstances" may justify a serial chapter 11 filing). Significant new debt incurred after the first Chapter 11 case can also be characterized as an unanticipated change in circumstances. *See Triumph Christian,* 493 B.R. at 490 (recognizing that "unanticipated changed circumstances sufficient to justify a debtor's serial Chapter 11 filing have been found where the debtor had amassed a significant amount of new debt after the initial Chapter 11 plan was substantially consummated") (citing *Garsal Realty, Inc.,* 98 B.R. at 149).
[20] The other two factors identified by the *Buoy* Court mirror the exceptions listed above:
"The foreseeability and substantiality of events which ultimately caused the subsequent filing;" and
"Whether the new plan contemplates liquidation or reorganization"
*Buoy,* 208 B.R. at 744.

Sandia Resorts about 26 months later in a foreclosure action commenced by FNBSF. The Confirmed Plan was substantially consummated.[21] Sandia Resorts filed it Second Chapter 11 Case less than three years after confirmation of the plan in the First Chapter 11 Case. The creditors and debt in the First Chapter 11 Case and Second Chapter 11 Case are substantially the same. Sandia Resorts has already restructured its debt to FNBSF through the First Chapter 11 Case, which is Sandia Resorts principal indebtedness. Sandia Resorts is not seeking an orderly liquidation of its assets through the Second Chapter 11 Case, but seeks to reorganize by modifying its obligations to FNBSF under the Plan confirmed in the First Chapter 11 Case, to which FNBSF objects. In particular, Sandia Resorts seeks to modify its obligation under the Third Modification to deposit funds into a capital expenditures escrow account, because, as Mr. Sian testified, Sandia Resorts' agreement to that provision was a "mistake." A second Chapter 11 case generally is not an appropriate vehicle for a debtor to change the agreement it made with its creditors in the prior Chapter 11 case because the debtor believes it should not have made that agreement in the first place.

Sandia Resorts identifies three factors it contends nevertheless justify its second Chapter 11 reorganization attempt in less than three years after substantial consummation of its Confirmed Plan in the First Chapter 11 Case: 1) FNBSF interfered with Sandia Resorts' ability to comply with the confirmed plan in the First Chapter 11 Case by causing serious and harmful delays in releasing funds from the capital expenditure escrow account; 2) the construction at I-

---

[21] The parties agree that the plan was substantially consummated in the First Chapter 11 Case. "A plan is 'substantially consummated' when: all or substantially all of the property to be transferred under the plan has in fact been transferred; the debtor or its successor under the plan has assumed the management of all or substantially all of the property dealt with by the plan; and distribution under the plan has commenced." *Adams,* 218 B.R. at 600 (citing 11 U.S.C. § 1101(2)). Sandia Resorts commenced making payments under the confirmed plan in the First Chapter 11 Case, continued to make payments for approximately two years, obtained a final decree, and managed an operated the Hotel until the Receiver was appointed. These facts sufficiently establish substantial consummation of the confirmed plan in the First Chapter 11 Case.

25 and Paseo Del Norte was not reasonably foreseeable or anticipated when the Amended Plan in the First Chapter 11 Case was confirmed or substantially consummated, and the construction project negatively impacted Sandia Resorts' ability to generate income from operation of the Hotel; and 3) FNBSF no longer has a security interest in Sandia Resorts' personal property. The Court will address each of these arguments in turn.

*FNBSF's Release of Funds from the Capital Expenditure Escrow Account*

Sandia Resorts blames FNBSF for its failure to generate sufficient income from the operation of the Hotel to make the payments required under the Confirmed Plan. A pool is an important amenity for a hotel's guests. The roof over the pool required repair in the winter of 2013 – 2014, and guests at the Hotel could not use the pool until it was repaired. Sandia Resorts offered evidence of email exchanges documenting its efforts to secure a release of funds from the capital expenditure escrow account to pay for the repair. *See* Exhibit HHH. Those exhibits show that Mr. Sian sent an email to a representative at FNBSF in mid-February of 2014 following up on the need for pool roof repairs. *See* Exhibit HHH. On the same day, FNBSF informed Mr. Sian that it needed a complete cost estimate and invoice. *Id.* Mr. Sian forwarded the contract from the contractor for the repair to his counsel on February 27, 2014. *Id.* The check was ultimately ready for pick up on April 24, 2014. *Id.* Sandia Resorts alleges that FNBSF's delay in releasing the funds was not anticipated and not reasonably foreseeable when the Amended Plan was confirmed or substantially consummated. Sandia Resorts contends further that the loss of income during the period when guests could not use the pool is directly attributable to FNBSF's own actions. This Court disagrees that these events establish an unforeseeable, unanticipated circumstance sufficient to justify the filing of this Second Chapter 11 Case.

15

The Third Modification included a procedure for the parties to follow if there was a disagreement on the use of funds from the capital escrow account. *See* Exhibit 26. The possibility that disputes could arise regarding funds in the capital escrow account therefore was anticipated by the parties at the time of confirmation in the First Chapter 11 Case. Furthermore, there is no evidence before the Court that Sandia Resorts followed this procedure when it was dissatisfied with the way FNBSF released funds from the capital escrow account to pay for repairs of deferred maintenance items at the Hotel. Nor does the evidence upon which Sandia Resorts relies demonstrate that FNBSF was the cause of Sandia Resorts' inability to make the required payments under the Confirmed Plan. If Sandia Resorts believes that FNBSF's actions excuse its performance as a contractual remedy under state law, it may assert that in the pending State Court Action.

*The I-25/Paseo Del Norte Construction Project*

Sandia Resorts characterizes the I-25/Paseo Del Norte construction project as not reasonably foreseeable or anticipated at the time of confirmation or substantial consummation in the First Chapter 11 Case. Mr. Sian testified that the construction project caused the Hotel to lose income. Insufficient evidence was presented to the Court to quantify any loss in income to Sandia Resorts attributable to the highway construction project. Thus, even if the Court were to accept the I-25/Paseo Del Norte construction project as an unforeseeable, unanticipated change in circumstances, Sandia Resorts has not demonstrated that the construction project substantially contributed to its inability to make the required capital expenditure escrow payments under the Confirmed Plan. *Cf. Adams,* 218 B.R. at 602 ("Even extraordinary and unforeseeable changes will not support a new Chapter 11, if these changes do not substantially impair the debtor's performance under the confirmed plan."). The Court also notes that the Hotel is located on Alameda and I-25, which is one exit further north than Paseo Del Norte. The highway

16

construction project is an insufficient justification for Sandia Resorts' need to file the Second Chapter 11 Case and restructure its debt to FNBSF a second time.

*FNBSF's Security Position*

Finally, Sandia Resorts asserts that FNBSF has lost its security interest in its personal property and that this significant change in FNBSF's security position is sufficient justification for filing a Second Chapter 11 Case in which Sandia Resorts proposes to change the repayment of FNBSF's debt. Whether FNBSF's security interest remains valid, and whether FNBSF has a lien on Sandia Resorts' personal property or holds a security interest in income from hotel guests as "rents" under applicable state law can be adjudicated in the States Court Action. It is insufficient grounds to demonstrate that Sandia Resorts filed the Second Chapter 11 Case in good faith. FNBSF has a mortgage against the real property where the Hotel is situated and remains Sandia Resorts' largest secured creditor. Other creditors in the Second Chapter 11 Case are substantially the same as the creditors in the First Chapter 11 Case.

Sandia Resorts failed to satisfy its burden of demonstrating that unanticipated, unforeseeable, changed circumstances justify the filing of this Second Chapter 11 Case. *See Triumph Christian Center,* 493 B.R. at 489 ("The Debtor bears the burden of demonstrating an unanticipated change in circumstances which would justify a serial Chapter 11 filing.") (citations omitted). The evidence before the Court instead indicates that Sandia Resorts' inability to make the payments required under the terms of the Confirmed Plan is attributable to ordinary foreseeable risks of continued business operations of the Hotel which was in dire need of deferred capital maintenance repairs at the time of confirmation and substantial consummation in the First Chapter 11 Case, or fails to show that an extraordinary, unforeseeable change in circumstances affected Sandia Resorts' ability to perform under the Confirmed Plan. None of

17

the justifications Sandia Resorts relies upon demonstrate an extraordinary, unanticipated, and unforeseeable change in circumstances warranting a second reorganization attempt. Based on the foregoing, the Court finds that "cause" exists under § 1112(b) to dismiss or convert this second, successive Chapter 11 case.

Having found "cause," the Court must also determine whether dismissal or conversion is in the best interest of creditors and the estate. 11 U.S.C. § 1112(b). The Court has broad discretion to determine whether a case should be dismissed or converted upon a finding of cause. *See Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir. 1989) ("The bankruptcy court has broad discretion under § 1112(b)."); *Nordyke,* 2011 WL 808193 at 6 ("The Court has wide discretion in determining whether to dismiss or convert.") (citation omitted). FNBSF has requested dismissal, rather than conversion. No other creditor nor the United States Trustee has voiced a preference for dismissal or conversion. No evidence was presented regarding whether there is any equity in Sandia Resorts' assets that could benefit unsecured creditors. Litigation between Sandia Resorts and FNBSF is already pending in the State Court Action where the Receiver was appointed before the filing of the Second Chapter 11 Case. The Court, therefore, finds that dismissal, rather than conversion, is appropriate.

## CONCLUSION

The Second Chapter 11 Case was filed for the purpose of restructuring the same debt to FNBSF that Sandia Resorts restructured in the First Chapter 11 Case and constitutes an impermissible attempt to circumvent the prohibition against post-substantial consummation modifications. *See Adams,* 218 B.R. at 600 ("Once its plan is substantially consummated, the debtor should not be able to circumvent or evade its binding responsibilities by filing what is in effect a modified plan."). The justifications Sandia Resorts relies upon in support of its good

18

faith in filing the Second Chapter 11 Case are insufficient. The Court will, therefore, grant

FNBSF's Motion to Dismiss. Dismissal renders moot the Motion to Excuse Turnover and the

Adversary Proceeding. The Court will enter orders and a judgment in the Adversary Proceeding

consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: February 5, 2016

COPY TO:

Shay E Meagle
Meagle Law, P.A.
Attorney for Debtor
6500 Jefferson St. NE, Ste. 260
Albuquerque, NM 87109-3490

Joshua R Simms
Joshua R Simms PC
Attorney for Debtor
PO Box 50332
Albuquerque, NM 87181-0332

Richard Leverick
Attorney for First National Bank of Santa Fe
5120 San Francisco Rd NE
Albuquerque, NM 87109-4610

Nathan C. Sprague
Attorney for Western Receiver
PO Box 27047
Albuquerque, NM 87125-7047

Ronald A. Tucker
Moses Dunn Farmer & Tuthill PC
Attorney for Western Receiver
PO Box 27047
Albuquerque, NM 87125