### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW MEXICO

In re:   SANDIA RESORTS, INC.,                                       No. 11-15-11532 JA

       Debtor.

## MEMORANDUM OPINION

Before the Court is the Debtor's Amended Motion for Designation of Ramada Worldwide, Inc.'s Ballots Accepting NCG, LLC's Amended Plan and Rejecting Debtor's Second Amended Plan under 11 U.S.C. § 1126(e) as Having Been Solicited in Bad Faith ("Motion for Designation of Ballots").  *See* Docket No. 259. The Court held a final, evidentiary hearing on the Motion for Designation of Ballots and took the mater under advisement.  Having considered the evidence in light of the applicable Bankruptcy Code sections and relevant case law, the Court concludes that the Motion for Designation of Ballots should be denied. The Court is not persuaded that NCG, LLC ("NCG") solicited the vote of Ramada Worldwide, Inc. ("RWI") in bad faith.

## FACTS

This is the second Chapter 11 bankruptcy case Sandia Resorts, Inc. ("Sandia Resorts") has filed.  Sandia Resorts commenced this voluntary Chapter 11 bankruptcy case on June 9, 2016.  Sandia Resorts owns and operates the America's Best Value Inn (the "Hotel") located at Alameda and I-25 in Albuquerque, New Mexico.  NCG purchased the note and mortgage secured by the Hotel from First National Bank of Santa Fe.  NCG filed a proof of claim asserting a secured claim against the estate in the amount of $1,876,286.16 representing unpaid principal, interest, receiver advances, costs and fees. *See* Claim No. 10-1.  If the Court disregards any deficiency claim NCG might have, RWI is Sandia Resorts' largest unsecured creditor, having filed an unsecured claim in the amount of $324,105.63.  *See* Claim No. 8-1.

NCG filed a Chapter 11 Liquidation Plan ("NCG's Plan") and Disclosure Statement for the Creditor's Liquidation Plan ("NCG's Disclosure Statement") on June 3, 2016. *See* Docket Nos. 83 and 84. The Court denied conditional approval of NCG's Disclosure Statement, with leave to file an amended disclosure statement providing additional information concerning the value or estimated value of the assets to be liquidated. *See* Docket No. 86. NCG filed an amended disclosure statement on June 8, 2016. *See* Amended Disclosure Statement for the Creditor's Liquidation Plan ("NCG's Amended Disclosure Statement") – Docket No. 87. The Court conditionally approved NCG's Amended Disclosure Statement on June 8, 2016, fixing a voting deadline of July 11, 2016 and a final hearing on July 18, 2016 to consider final approval of NCG' Amended Disclosure Statement and confirmation of NCG's Plan. *See* Docket No. 91.

Sandia Resorts filed a Chapter 11 plan and disclosure statement on June 28, 2016. *See* Debtor's Plan of Reorganization Dated June 17, 2015 [*sic.*] – Docket No. 109; Disclosure Statement to Debtor's Plan of Reorganization Dated June 28, 2015 [*sic.*] – Docket No. 110. The Court required Sandia Resorts to add certain language to its disclosure statement before granting conditional approval. *See* Docket No. 115. Sandia Resorts amended its disclosure statement (*see* Amended Disclosure Statement to Debtor's Plan of Reorganization Dated June 28, 2015 [*sic.*] ("Sandia Resorts' Amended Disclosure Statement") - Docket No. 116) on July 1, 2016, and the Court conditionally approved it on the same day. *See* Docket No. 117. Sandia Resorts amended its plan on July 5, 2016. *See* Debtor's Amended Plan of Reorganization dated June 27, 2015 [*sic.*] ("Sandia Resorts' Amended Plan") – Docket No. 119.

Neither NCG's Plan nor Sandia Resorts' Amended Plan was confirmed at the July 18, 2016 hearing. Instead, the Court vacated the existing confirmation deadlines and fixed a

2

deadline for Sandia Resorts and NCG to file a further amended plan and/or disclosure statement. *See* Docket Nos. 148, 153.

NCG and Sandia Resorts amended their respective plans and disclosure statements. *See* Second Amended Disclosure Statement for the Creditors' Liquidation Plan ("NCG's Second Amended Disclosure Statement) – Docket No. 160; Amended Chapter 11 Liquidation Plan ("NCG's Amended Plan") – Docket No. 161; Debtor's Second Amended Plan of Reorganization dated August 1, 2016 ("Sandia Resorts' Second Amended Plan") – Docket No. 162; and Corrected Second Amended Disclosure Statement to Debtor's Plan of Reorganization Dated August 1, 2016 ("Sandia Resorts' Second Amended Disclosure Statement") – Docket No. 164. On August 2, 2016, the Court conditionally approved NCG's Second Amended Disclosure Statement and Sandia Resorts' Second Amended Disclosure Statement, directed each plan proponent to prepare and serve its own solicitation packages by August 4, 2016, and fixed a voting deadline of September 6, 2016. *See* Docket No. 166.

NCG's Amended Plan is a liquidating plan that proposes to sell Sandia Resorts' assets free and clear of all liens, claims and encumbrances to NCG in full satisfaction of its mortgage indebtedness. *See* Docket No. 160. NCG asserts that under its Amended Plan, unsecured creditors will likely receive fifteen cents on the dollar. Sandia Resorts' Second Amended Plan provides for its continued operation of the Hotel. Under Sandia Resorts' Second Amended Plan, holders of allowed unsecured claims are to receive a *pro rata* share of $66,000 over a sixty-month period beginning 60 days after the plan's effective date. *See* Docket No. 162. NCG made an election under 11 U.S.C. § 1111(b)(2) with respect to Sandia Resorts' Second Amended Plan. *See* Docket No. 216. The final confirmation hearing on the competing plans is currently scheduled for November 29 – December 2, 2016. *See* Docket No. 256.

3

Most hotels are "flagged" under a particular brand.  Hotels need a flag to be better positioned to get reservations in the market.  "Re-flagging" a hotel means to change the association of a hotel with a particular hotel chain.   Every flag has different requirements that a hotel franchisor will require a particular hotel to meet before granting a flag to a hotel under a particular brand name.  Typically, the hotel owner signs a franchise agreement under which it pays a percentage of its gross revenues to the franchisor in exchange for flying its "flag."  Although the Hotel at one time was flagged as a Ramada hotel with RWI, the Hotel is currently flagged as an America's Best Value Inn ("ABV"), which is part of the Vantage hotel group.  RWI is part of the Wyndham hotel group.  Ramada, which is one of the Wyndham group's flags, is considered a higher quality flag than ABV.   RWI is a large institutional creditor; it is represented by bankruptcy counsel in this bankruptcy case.

Gary Grewal is the principal of NCG.  Another one of his entities owns and operates another hotel in Bernalillo, New Mexico as a Super 8 Motel.  Like Ramada, Super 8 Motel is part of the Wyndham hotel group.  Mr. Grewal has been associated with Wyndham for 14 years.  The percentage fee the Wyndham hotel group receives from Mr. Grewal's operation of the Super 8 Motel in Bernalillo is currently 8%.

If NCG acquires the Hotel through confirmation of NCG's plan, NCG would endeavor to re-flag the hotel to a higher level flag.  Mr. Grewal began investigating options for reflagging the Hotel in June of 2016.  He considered retaining the ABV flag if necessary.  He also reached out to representatives of RWI.  On June 29, 2016, shortly after representatives of RWI had conducted an in-person inspection of Mr. Grewal's' Super 8 Motel, Mr. Grewal sent an email regarding NCG's plan to Kevin Clayton who works for RWI.  The email included the following verbatim statements:

4

> Since he did not pay (only promises to pay) in last three years most creditor in favor of my plan I have submitted in court. But it will be big help if I can get Ramada vote also. In my plan Ramada getting between 40 to 50 thousand dollar with in month instead of getting nothing from other side.
>
> Exhibit AA.

Mr. Grewal sent this email after conditional approval of NCG's Amended Disclosure Statement, but two days before conditional approval of Sandia Resorts' Amended Disclosure Statement. With respect to Mr. Grewal's statement in the June email suggesting that RWI would get nothing under Sandia Resorts' plan, Mr. Grewal testified that he was referring to the treatment of RWI's claim in Sandia Resorts' prior bankruptcy case. The Court does not find that testimony credible.

In August of 2016, after the Court conditionally approved NCG's Amended Disclosure Statement and Sandia Resorts' Second Amended Disclosure Statement, Mr. Grewal also communicated with Tom Fransen of Wyndham Hotel Group regarding the re-flagging of the Hotel. Mr. Grewal sent an email to Mr. Fransen dated August 30, 2016, which stated:

> Just to keep you brief update on this case that David has concern (hypothetically) if our plan does not pass than case will go to liquidation and Ramada will lose money or he may end up making trip to Albuquerque (or hire local attorney in Albuquerque for one day) In this case we have sent our following offer to your legal team David Catungo.
>
> Please I need you help to make sure Ramada would ballot timely, September 6, and vote No on Sandia Plan.
>
> Exhibit 5, p. 46.

Mr. Grewal testified that it was his understanding that RWI's attorney and its legal department would handle voting on the competing plans.

NCG's counsel also sent several emails to counsel and other representatives of RWI concerning NCG's and Sandia Resorts' competing plans, voting, and Mr. Grewal's discussions with contacts at RWI regarding the potential reflagging of the Hotel. *See,* Exhibit 5, pp. 1, 5, 10,

31, and 41.[1]  Some of those emails reported Mr. Grewal's communications with Tom Fransen,

and suggested that NCG would seek a Wyndham brand flag for the Hotel if NCG's plan is

approved.  *See, e.g.,* Exhibit 5, p. 21 ("Mr. Grewal, of NCG, has been speaking to Tom Fransen .

. . re a Wyndham brand flag for the hotel assuming we get our plan approved and take title to the

hotel.").  The emails also sought a vote from RWI to accept NCG's plan and to reject Sandia

Resorts' Plan.  *See, e.g.,* Exhibit 5, p. 41 – Email dated September 1, 2016 from Mr. Leverick to

Mr. Catuogno ("We definitely want to keep your client balloting for us and against Sandia

Resorts."); Exhibit 5, p. 36 – Email dated August 25, 2016 from Mr. Leverick to Mr. Catuogno

("[W]e . . . need the No ballot and would like to get ASAP").

---

[1] An email dated June 28, 2016 from Mr. Leverick to Michal Connolly, attorney for RWI stated, in part:
> Our plan would, if approved, result in payment of approximately 15 cents per dollar on the unsecured claims . . . approximately 30 days after the Plan's approval. . . . . Debtor is suggesting in some of its filings that the hotel is worth only $800,000 . . . . The unsecured claims would likely recover very little if anything. . . . My client has begun speaking to his contacts with Ramada about branding the hotel, if our Plan is approved, with a Ramada or affiliate flag in the next year or so.  In addition to paying the secured and priority liens in full within 30 days of plan approval, as noted, we would be paying the unsecured claims about 30 days out approximately 15 cents per dollar. . . . We would also like your completed, dated ballot.
> Exhibit 5, p. 1

An email dated June 29, 2016 from Mr. Leverick to Michael Connolly stated, in part:
> My client is speaking to Ramada, on a go forward basis, about flagging the hotel as a Ramada brand. I believe my client is arranging a meeting to speak to a local rep from Ramada for this purpose assuming our Plan is approved.  We really want Ramada's support for our plan, plus its ballot . . .
> Exhibit 5, p. 5.

An email dated June 30, 2016 from Mr. Leverick to Julie Weiswasser at Wyndham stated, in part:
> Our client, NCG, has been in discussions . . . about the possible reflagging of the Sandia Resorts hotel to a Wyndham flag assuming Creditor's plan is approved and certain PIP improvements, long overdue, are made to the hotel.   The Debtor's plan . . . would pay a total of $65,000 to all unsecureds, to be distributed pro rata . . . as compared to our Plan which proposes to pay the unsecureds the $100,000 . . . . In order to succeed, we need Ramada's ballot . . .
> Exhibit 5, p. 10.

An email dated August 14, 2016 from Mr. Leverick to David Catuogno, counsel for RWI stated, in part:
> I wanted to follow up with you to let you know that my client's dialogue with the local Ramada rep on a Baymont (Wyndham) Flag for the hotel, assuming we win on the competing plans, is continuing . . . . [W]e appreciate your [sic.] and your client's continued support and the opportunity, hopefully soon, to put this hotel back into good condition and reflag it with the Baymont flag.
> Exhibit 5, p. 31

An email dated September 1, 2016 from Mr. Leverick to Mr. Catuogno stated, in part:
> We definitely want to keep your client balloting for us and against Sandia Resorts. . . . PS, Gary and the franchise guy for Ramada were in communication again yesterday so we continue to move along that path for what appears to be a Baymont franchise.
> Exhibit 5, p. 41.

6

In an email sent July 8, 2016 to RWI's counsel, Mr. Leverick, NCG's counsel, stated:

> We really need a ballot/firm decision on Ramada's part today, and I think you can see that the Debtor's plan is contingent on cramming down the hotel value from $2,700,000 valued by the Debtor in 2011/2012 . . . to $800,000 today, with the same owner/manager running the Hotel that has failed on its first plan etc., which is likely not ever going to get approval . . . We have a plan that can succeed . . . and can lead to a hotel that, once improved, could be reflagged to a Wyndham brand. Otherwise, Wyndham gets nothing . . . . from the Debtor.

Exhibit 5, p. 21.

At one point, Mr. Grewal represented that NCG had an interested party who would purchase RWI's claim for $1,000 more than any competing offer if RWI wanted to sell its claim. *See* Exhibit 5, p. 47 - Email dated September 23, 2016 from Mr. Grewal to Mr. Leverick ("If they thinking to sell the claim please let me know we have third party who will pay thousand dollars more than other side offer and will mail the check today."); Exhibit 5, p. 36 – Email dated August 25, 2016 from Mr. Leverick to Mr. Catuogno ("[W]e are more than willing to buy the claim . . . . we would buy the claim and have the transferor, Ramada, ballot no").

As part of the ongoing discussions regarding reflagging the Hotel, RWI's regional representative agreed to waive the $50,000 franchise fee. *See* Exhibit 5, p. 41. Mr. Grewal anticipates that it would take $500,000 to make improvements to the Hotel plus another $200,000 in case goods and linens to bring the Hotel to the standard required for a Ramada flag; email communications from NCG's counsel to RWI's counsel indicate that NCG is willing to invest those amounts. *See* Exhibit 5, p. 31 – Email dated August 14, 2016 from Mr. Leverick to David Catuogno ("[W]e are working on a PIP [project improvement plan] for the hotel that will call for something close to $500,000 of capital improvements and for the purchase of new case goods/linens, etc. . . ."). If NCG made those improvements to the Hotel, Mr. Grewal believes the Hotel could generate revenues in excess of $1,000,000 per year. *See* Exhibit 5, p. 41 – Email dated September 1, 2016 from Mr. Leverick to Mr. Catuogno ("We think gross revenues for the

hotel, once we spend about $500,000 or so on the real property improvements and $200,000 or

so on the case goods, linens and new tv stuff, could easily exceed $1,000,000 a year . . .").  Mr.

Grewal does not know what the percentage fee would be if the Hotel were re-flagged with RWI.

If the fee is similar to the 8% fee he currently pays for the Super 8 Motel, RWI could expect to

earn $80,000 per year.

Currently, there is no agreement to re-flag the Hotel with RWI.  Even if NCG's plan is

confirmed, NCG has no legal obligation to apply to re-flag the Hotel with RWI; and even if such

application were made, RWI has no obligation to grant it.  RWI would need to consider whether

NCG can meet the requirements to re-flag the Hotel.

RWI voted to reject Sandia Resorts' Second Amended Plan.  *See* Exhibit 4, p. 7.  RWI

voted to accept NCG's Amended Plan.  *See* Exhibit 1, pp. 12-13.

DISCUSSION

Sandia Resorts requests the Court to "designate" RWI pursuant to 11 U.S.C. § 1126(e) as

an entity whose votes rejecting Sandia Resorts' Second Amended Plan and accepting NCG's

Amended Plan were solicited or procured in bad faith.  That section provides:

> On request of a party in interest, and after notice and a hearing, the court may designate
> any entity whose acceptance or rejection of such plan was not in good faith, or was not
> solicited or procured in good faith or in accordance with the provisions of this title.

11 U.S.C. § 1126(e).

Designation under 11 U.S.C. § 1126(e) is permissive and falls within the Court's sound

discretion.  *See* 11 U.S.C. § 1126(e) ("*may* designate"); *In re DBSD North America, Inc.,* 421

B.R. 133, 137 (Bankr. S.D.N.Y. 2009), *aff'd,* 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010)

("Section 1126(e) is permissive in nature, and a bankruptcy judge has discretion in designating

votes.") (citations omitted).

8

If RWI is designated, its ballot rejecting Sandia Resorts' Second Amended Plan will not be counted under 11 U.S.C. § 1126(c) for purposes of determining whether the class of unsecured claims that includes RWI's claim has accepted Sandia Resorts' Second Amended Plan; nor will RWI's ballot accepting NCG's Amended Plan be counted. *See In re Bataa/Kierland, LLC,* 476 B.R. 558, 564 (Bankr. D. Ariz. 2012) ("The language of the Code does not specify the consequences of so 'designating' . . . but the origins and history of the provision make clear . . . that . . . 'designate means disqualify from voting.'") (quoting *Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am (In re Figter Ltd.),* 118 F.3d 635, 638 (9th Cir. 1997)). Absent designation of RWI, it appears that Sandia Resorts will be unable to confirm its Second Amended Plan.[2]

The party requesting designation of an entity based on bad faith solicitation bears the burden of proving that the entity's acceptance or rejection of a plan was not solicited or procured in good faith. *See In re DBSD North America, Inc.,* 634 F.3d 79, 102 (2nd Cir. 2011) ("[A] party seeking to designate another's vote bears the burden of proving that it was not cast [or solicited] in good faith.") (citation omitted); *In re Charles St. African Methodist Episcopal Church,* 480 B.R. 66, 68 (Bankr. D. Mass. 2012) ("the burden of proving gad faith is on the party seeking designation") (citation omitted). It is a heavy burden. *See Bataa/Kierland,* 476 B.R. at 566 (the party requesting designation "has a heavy burden of proof because designation is a narrow exception . . ."). Designation under 11 U.S.C. § 1126(e) should be applied "sparingly, as 'the exception, not the rule.'" *DBSD North America,* 634 F.3d at 101-102 (quoting *In re Adelphia Communications Corp.,* 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006)).

---

[2] The Court will not consider the effect of designation on confirmation as a factor relevant to its good faith determination under 11 U.S.C. § 1126(e).

Many of the cases interpreting 11 U.S.C. § 1126(e) focus on the creditor/voter's conduct in casting its ballot, rather than the solicitor's conduct in soliciting or procuring the creditor's vote. *See, e.g., Figter,* 118 F.3d at 638-640; *DBSD North America,* 634 F.3d at 101-104; *In re Lloyd McKee Motors, Inc.,* 157 B.R. 487 (Bankr. D.N.M. 1993). Here, Sandia Resorts concedes that RWI did not act in bad faith by voting to reject Sandia Resorts' Second Amended Plan or by voting to accept NCG's Amended Plan. Rather, Sandia Resorts contends that NCG did not act in good faith in soliciting RWI's rejecting ballot for Sandia Resorts' Second Amended Plan and RWI's accepting ballot for NCG's Amended Plan. Bad faith solicitation or procurement is a separate, additional prohibition under 11 U.S.C. § 1126(e). *See, In re Quigley Co., Inc.,* 437 B.R. 102, 130-131 (Bankr. S.D.N.Y. 2010) (recognizing that, "[w]hile the decisions have typically focused on the voting creditor's motive, the statute is broader: it provides a basis to designate without regard to the creditor's motive, where the vote is 'solicited or procured' in bad faith.").

The Bankruptcy Code does not define good faith for purposes of 11 U.S.C. § 1126(e). *See Bataa/Kierland,* 476 B.R. at 564 ("the meaning of 'good faith,' as used in § 1126(e), was also intentionally left undefined by Congress.") (citation omitted).[3] Whether an entity acted in good or bad faith "hinges on an essentially factual inquiry and is driven by the data of practical human experience." *DBSD North America,* 634 F.3d at 102 (citation and internal quotation marks omitted). *See also, Figter,* 118 F.3d at 639 (observing that "the concept of good faith [under §1126(e)] is a fluid one, and no single factor can be set to inexorably demand an ultimate result, nor must a single set of factors be considered."). Designation of an entity under 11 U.S.C. § 1126(e) may be appropriate if the solicitation taints the free-election process of creditor

---

[3] *See also Figter,* 118 F.3d at 638 ("The Bankruptcy Code does not further define the rather murky term 'good faith.'").

10

voting,[4] or when a party uses the voting process to accomplish some improper, ulterior purpose. *See Bataa/Kierland,* 476 B.R. at 566 (acknowledging that "[o]ther modern cases applying § 1126(e) concur that bad faith is primarily to be found in ulterior motives . . ."); *In re Landing Assocs., Ltd.,* 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993) (observing that § 1126(e) applies "when the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself . . ."). *See also, Figter,* 118 F.3d at 639 ("If a person seeks to secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad faith.") (citation omitted); *Lloyd McKee,* 157 B.R. at 489 (stating that the good faith "inquiry is 'whether a vote was cast for the ulterior purpose of securing some advantage to which the creditor would not otherwise have been entitled.'") (quoting *In re Marin Town Center,* 142 B.R. 374, 378-379 (N.D. Cal. 1992) (remaining citations omitted).

### *Timing of NCG's solicitation efforts*

Post-petition solicitation efforts may not begin until after the Court approves the disclosure statement, 11 U.S.C. § 1125(b),[5] or, upon conditional approval of a disclosure statement containing "adequate information." 11 U.S.C. § 1125(f)(2) (modifying 11 U.S.C. §

---

[4] *See Century Glove, Inc. v. First Am. Bank of New York,* 860 F.2d 94, 97 (3d Cir. 1988) (Section 1126(e) "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'"); *Bakes v. Official Committee of Unsecured Creditors,* 359 B.R. 831, 835-836 (S.D. Fla. 2006) (a plan-proponent's provision of a pre-marked ballot form generally constitutes *per se* bad faith solicitation because it taints the free-election process of creditor voting).

[5] Section 1125(b) provides, in relevant part:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.
> 11 U.S.C. § 1125(b).

Improper solicitation under 11 U.S.C. § 1125(b) may serve as a sufficient grounds for designation under 11 U.S.C. § 1126(e); designation under 11 U.S.C. § 1126(e), however, is broader than 11 U.S.C. § 1125(b) and encompasses a wider range of improper behavior. *See Century Glove,* 860 F.2d at 97 (explaining that "Section 1125(b) bars certain solicitation activities, regardless of the intent of the actor . . . . Section 1126(e), on the other hand, is not simply a remedy for § 1125(b) violations. It grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'").

1125(b)'s requirement of an approved disclosure statement). *See also, Century Glove,* 860 F.2d at 100 (stating that § 1125(b) "never limits the facts which a creditor may receive, but only the *time* when a creditor may be solicited.") (emphasis in original). All of NCG's communications regarding its own plan occurred *after* the Court conditionally approved NCG's Disclosure Statement on June 8, 2016.[6] Mr. Grewal sent one email to a representative of RWI after the Court had conditionally approved NCG's Disclosure Statement, but before Sandia Resorts had filed its plan. *See* Exhibit AA. In that email, Mr. Grewal suggested that NCG's plan would provide RWI with $40,000 to $50,000 within a month, "instead [of] getting nothing from other side." Exhibit AA.

Sandia Resorts contends that this email communication constitutes an improper solicitation because it was made before the Court conditionally approved Sandia Resorts' Amended Disclosure Statement. Solicitation for purposes of 1125(b) is construed narrowly; solicitation occurs only when a debtor or creditor makes a "specific request for an official vote." *In re Snyder,* 51 B.R. 432, 437 (Bankr. D. Utah 1985) ("The terms 'solicit' and 'solicitation,' as used in § 1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization. The terms do not encompass discussions, exchanges of information, negotiations, or tentative arrangements . . . ."). *See also, Century Glove,* 860 F.2d at 101 ("We agree with the district court that 'solicitation' must be read narrowly."). The email asks for RWI's help in voting to accept NCG's Plan, but does not contain a clear request for a vote to reject Sandia Resorts' Plan. Even though this communication occurred before the conditional approval of Sandia Resorts' Amended Disclosure Statement, the Court finds that the communication does not constitute a solicitation of

---

[6] NCG's second round of communications occurred after the Court conditionally approved NCG's Amended Disclosure Statement and Sandia Resorts' Second Amended Disclosure Statement on August 2, 2016.

a vote to reject Sandia Resorts' plan and is, therefore, an insufficient basis by itself for designation of RWI under 11 U.S.C. § 1126(e).

*Content of NCG's solicitation efforts*

Many of NCG's communications to RWI concern NCG's potential re-flagging of the Hotel if NCG's plan is confirmed. *See, e.g.,* Exhibit 5, pp. 1, 5, 10, 21, 31, and 41. These communications suggest that NCG is attempting to gain RWI's acceptance of its plan by promising a future relationship with RWI that could generate royalty fees for RWI. The emails imply a promise that NCG will seek to re-flag the Hotel with RWI in exchange for RWI's vote to accept NCG's plan and to reject Sandia Resorts' plan. NCG's communications to RWI also suggest that NCG is willing to contribute $500,000 to improve the Hotel. None of this information is contained in NCG's conditionally approved disclosure statement. Once a disclosure statement is approved, however, a soliciting creditor is not necessarily precluded from sending additional information beyond what is included in the disclosure statement. *See Century Glove,* 860 F.2d at 101 (concluding that "[o]nce adequate information has been provided a creditor, § 1125(b) does not limit communication between creditors."). *See also, In re Apex Oil Co.,* 111 B.R. 245, 249 (Bankr. E.D. Mo. 1990) (holding "that a party need not receive prior court approval of all material used to solicit another creditor's acceptance or rejection of the debtor's plan[,]" but cautioning that parties distributing "information not contained in the approved disclosure statement [do so] at their peril[.]").

The facts and circumstances surrounding NCG's actions do not rise to the level of improper solicitation under 11 U.S.C. § 1125(b) nor bad faith solicitation under 11 U.S.C. § 1126(e). NCG's failure to include in its disclosure statement its future plans to reflag the Hotel post-confirmation does not harm, or even affect, other creditors. NCG has proposed a

13

liquidating plan whereby it will acquire the Hotel free and clear of liens in full satisfaction of its claim that would have been under-secured had NCG not made an election under 11 U.S.C. § 1111(b).  Creditors, including RWI, can expect to receive approximately fifteen cents on the dollar under NCG's Amended Plan.

In addition, because of Mr. Grewal's ongoing relationship with RWI in connection with his Super 8 Motel, it was only natural for Mr. Grewal to reach out to RWI regarding the prospect for re-flagging the Hotel to a higher level brand if NCG acquires the Hotel through confirmation of its plan.  NCG did not offer RWI special treatment that it would not otherwise be entitled to receive as an improper inducement to vote to accept NCG's Amended Plan and reject Sandia Resorts' Second Amended Plan.  Under these circumstances, NCG need not disclose to other creditors what might happen *after* confirmation of its Amended Plan.

Similar to vendors in a Chapter 11 reorganization proceeding, it is only natural that a successful plan proponent will want to continue doing business with vendors who voted in favor of its plan.  *Cf. DBSD North America,* 634 F.3d at 102 (observing that "trade creditors who do regular business with a debtor may vote in the way most likely to allow them to continue to do business with the debtor after reorganization.") (citing *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,* 987 F.2d 154, 161-62 (3d Cir. 1993)).  Even if the communications suggest that NCG will seek to re-flag the Hotel with RWI if RWI votes in favor of its plan, none of the communications between NCG and RWI require NCG to re-flag the Hotel with RWI.  Nor do they require RWI to accept NCG's application to re-flag the Hotel.

Sandia Resorts also suggests that NCG's communications to RWI contain mis-information concerning Sandia Resorts' plan that RWI will receive nothing under Sandia Resorts' plan.  Information provided beyond the information contained in an approved disclosure

14

statement must not be false or misleading. *See Apex Oil,* 111 B.R. at 249 (holding that a soliciting party need not obtain prior court approval of solicitation materials provided "the information [in the solicitation materials] is truthful and absent of any false or misleading statements or legal or factual mischaracterizations.").[7] *See also, In re Gulph Woods Corp.,* 83 B.R. 339, 343 (Bankr. E.D. Pa. 1988) (finding that communications that "would tend to unfairly influence votes" constitute improper solicitations under § 1125(b)).

RWI received solicitation packages from both NCG and Sandia Resorts containing their respective plans and disclosure statements. RWI is a sophisticated national creditor that has retained bankruptcy counsel to represent it in this bankruptcy case. It is capable of evaluating the competing plans itself to determine what it can expect to receive under each of the competing plans. There was no danger that NCG's communications concerning Sandia Resorts' Amended Plan or Sandia Resorts' Second Amended Plan would improperly influence RWI. Under these circumstances, the Court has determined, in the exercise of its reasonable discretion, that NCG's suggestion to RWI that Sandia Resorts would not discharge its obligations to unsecured creditors under its plan does not warrant a designation under 11 U.S.C. § 1125(e).

## CONCLUSION

Sandia Resorts has not met its burden of demonstrating that NCG's solicitation or procurement of RWI's vote was not in good faith. NCG's negotiations with RWI regarding the future potential to re-flag the Hotel with RWI after confirmation fail to demonstrate an improper ulterior motive justifying designation of RWI under 11 U.S.C. § 1126(e). As Sandia Resorts

---

[7] The *Apex Oil* court imposed two other conditions on solicitation materials containing information outside the information contained in an approved disclosure statement:  1) the information must be presented in good faith; and 2) the soliciting party must not "propose or suggest an alternative plan which has yet to gain court approval or otherwise fail[ ] to travel through the appropriate legal channels, as dictated by the Bankruptcy Code." *Id.* at 249. The Court has necessarily considered the good faith requirement in determining whether RWI should be designated under 11 U.S.C. § 1126(e).  The other *Apex Oil* factor is inapplicable.

conceded, RWI's actions in voting its claim are not at issue. NCG did not improperly influence

RWI or taint the voting process by reaching out to RWI to explore the possibility of re-flagging

the Hotel with RWI in the event NCG acquires the Hotel through confirmation of its plan. In

sum, the Court is not persuaded that NCG failed to solicit RWI's vote in good faith.

Accordingly, the Court will deny the Motion for Designation of Ballots. The Court will enter a

separate order consistent with this Memorandum Opinion.

_____

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: November 4, 2016

COPY TO:

Shay E Meagle
Attorney for Sandia Resorts, Inc.
Meagle Law, P.A.
315 Alameda Blvd. NE., Ste. D
Albuquerque, NM 87113

Richard Leverick
Attorney for NCG, LLC
5120 San Francisco Rd NE
Albuquerque, NM 87109-4610

David S. Catuogno
LeClairRyan, P.C.
Attorney for Ramada Worldwide, Inc.
1037 Raymond Boulevard, 16th Floor
Newark, NJ 07102